### 33648. MARTIN v. LIFE & CASUALTY INSURANCE COMPANY OF TENNESSEE.

DECIDED SEPTEMBER 12, 1951.

*Raymond M. Reed,* for plaintiff.

*William F. Buchanan,* for defendant.

FELTON, J. The only evidence concerning the facts surrounding the death of insured introduced by plaintiff was the deposittion of Dr. J. R. Doty, Coroner of Lake County, Indiana, at the time of insured's death in that county, which deposition was taken on behalf of defendant. The other evidence concerning the death was the depositions of Alvin R. Davis, maintenance man at the hotel in which deceased died and the person who discovered insured's body; of Carl Peters, the patrolman who answered the call reporting the discovery of the body; and Ted Ignat, the detective who made an investigation of the death. Dr. Doty testified in part: "Mr. Martin was lying on the floor on his left side in a pool of blood; he had been dead for some time and was lying near the bed. This bed was located on the north side of the room and the dresser was in the southeast corner of the room and he was lying between the bed and the dresser. We rolled him over and underneath his body, near his right hand, was an automatic revolver of foreign German make. This gun was not in his hand, but near his right hand and under his body. There was a bullet hole through the head, starting at the right temporal region, about an inch and a half in front of the right ear, and this went through the head and came out on the opposite side of the head. There was a mirror on the dresser which had been punctured by a bullet, and we found where the bullet had entered the wall back of the dresser. In connection with my duties as Coroner of Lake County, I have had occasion to investigate into the cause of death of people and to make examinations in connection with their deaths. I reached the conclusion as to the cause of death of Mr. Martin, which was that this man's death was due to a gunshot wound in the head." Mr. Davies testified in part: "Mr. Martin roomed on the third floor in Room 311. There were two outside windows in the room which faced north. There are two entrances

into the room. It had been a double room, but one door was sealed, and it was not rented as a double room but as a single room and there was only one usable entrance. There was a lock on the door, I believe it was what they call a frame night latch if I am not mistaken. I last saw Mr. Martin after the evening I told you about the following morning when I found him dead. The occasion for my finding the man was that I had been requested by the maids to open the door so they could enter and clean his room. These maids were inexperienced and not acquainted with the keys, did not know what key opened which door. I opened the door to make certain the man was not in the room due to the fact that the maids were not familiar with his working hours and I thought I had better look to see if he was out of the room. I could not tell you the exact time I opened the door, I would say between eight and eleven o'clock in the morning because I was working at that time. As to what I discovered when I opened the door, the first thing was that the man was not in bed and I did not see him. I was about to turn to leave and noticed the mirror on the inside of the room and noticed it had a hole in it. This drew my attention for a minute and by that time I had become accustomed to the light in the room, which was hazy and I happened to look down and saw the man lying on the floor at my feet. The body was clothed. The wound or injury on the body that I discovered was a hole in his head, I might say that I saw that after I turned the light on. At the time I first saw him I did not know he was hurt but when I turned the light on I could see that he had been shot and had a hole in his head and it looked like he had been shot, especially after I saw the hole in the mirror. I am not positive whether the windows were up or not. The one blind was completely down and the other raised about a foot from the bottom. I do not believe the blinds were torn or damaged in any way and there were no windowpanes broken. I could not say if the bed had been slept in or not, it was mussed up. The bed was in the center of the room, with the head of the bed to the east. . . I do not know if Mr. Martin owned a gun, but I do know he offered one either for sale or he would like to borrow money on one. When the conversation came up about the gun I was not interested enough to know whether he owned

the gun or not. There was a conversation with respect to a gun approximately a week before his death. I did not actually see the gun he offered to sell or to borrow money on. I never touched the body. I do not know whether the room was disturbed or not, there was no damage done to the room except where the bullet entered the mirror and also the wall. The doors and windows were in good condition. I would not swear as to which side of this man's head the bullet entered but I believe the left side. There was lots of blood on the floor and it was not fresh blood but dried and congealed. Neither of the maids entered the room with me. So far as I know I was the first person to discover the body. . . There is no fire escape from Room 311 to the street. The only usable entrance to Room 311 is through the door that I entered. There is another entrance which had been nailed shut, and there is no key for the lock. The door is locked and the key is not available. When I found the body it was between the bed and the dresser. I would say the size of the room was about nine by twelve feet. As soon as I discovered the body I closed the door and called the police and the coroner. . . I do not know of Mr. Martin ever having any trouble with anyone while he was up here and I know of no one who was an enemy of Mr. Martin. To my knowledge he was a likable man. So far as I know he worked regularly. . . Rooms 311 and 312 did not use a common bathroom. There are no rooms with private baths. Everyone uses the same bath. The bath for 311 and 312 is located across the hall, approximately two rooms down. Those rooms are so arranged that there is no bathroom connecting the two rooms. You cannot go into one room and use the bathroom used by the room next door. The body was in a sort of crumpled position, lying on one side of his face. . . The head of the body was toward the wall and the feet toward the bed. His head was against the base board about one and a half feet from the door. The head of the bed was to the east and the mirror would be to the south and east of the bed. The bed had been used but I do not know whether it had been slept in or not but he might have laid down on it as it was mussed. I did not make a close observation as to the bullet hole in the man's head." Mr. Peters testified in part: "During May, 1948, I received a call to go to the Almo

Hotel, at approximately 9:49 in the a.m. I believe this was the 11th day of May. Officer Jacobs went with me to the hotel where we were met by the manager who directed us to Room 311 where he found the body of Shirley Martin lying on the floor. The coroner, Dr. Doty, was there and the gun was found under the body when the coroner moved him. I saw the gun, it was a foreign make of gun, a 32 calibre. I did not investigate the gun and I don't know whether it had been used or not. In my opinion the man had been dead for sometime as there was a great deal of blood under him and it had started to coagulate already. There was a wound in the head, I believe it was on the right side. I didn't notice anything disturbed in the room, other than the bed being mussed up like it had been slept in and maybe not made. The blinds were partly down, not all the way. . . No, I did not examine the gun. I did look the body over and we looked around for a weapon, because there was a smashed mirror in the room but we did not find the weapon at that time but when the coroner came and I helped him turn the body over the gun was there; the coroner picked it up and examined it. The gun had a clip, I would say it held about five or six bullets and at that time it held three bullets. The body was in a crumpled position. . . I remember looking for the bullet but I can't say for sure whether we found it or not but we did find a hole in the mirror and back of the mirror there was a hole in the plaster wall, I would say approximately four feet from the floor. The body was fully clothed." Mr. Ignat testified in part: "Testifying from my report of the case, this happened on May 11, 1948, at about 9:49, that is we received the call at that time. After preliminary investigation by patrol officers, Hamilton and myself were assigned to subsequent investigation at the hotel and we went to the hotel to investigate. I personally examined Room 311 at the Almo Hotel a day or two after the death. I observed a bullet hole through a mirror in the room, I would say about four and a half feet from the floor. I don't recall meeting Mr. Martin's wife when she came to Gary. I never found anyone who had a quarrel with Martin and no one who might have been an enemy of his. I didn't know the man at all; I never received any reports from anyone around the hotel of Mr. Martin having any trouble with anyone."

1. The plaintiff relied upon the presumption against suicide to make out her case. However, the presumption against suicide will vanish upon proof of physical facts clearly inconsistent therewith. *Gem City Life Ins. Co.* v. *Stripling*, 176 *Ga.* 288, 290 ·(168 S. E. 20). The testimony of the witnesses concerning the physical facts surrounding the death of insured was substantially the same and without material conflict; therefore, a finding was demanded either for plaintiff or defendant. We think that the only reasonable inference that can be drawn from the evidence was that insured ·committed suicide. The bullet entered the head at the temple in front of the right ear and came out the other side of the head and struck a mirror at the height of about four feet from the floor. This seems to exclude the principle that deceased accidentally shot himself. It would be unreasonable to infer that deceased, assuming that he was standing or sitting at the time, could have handled the pistol in such a manner as to accidentally discharge the pistol so that the bullet would pass through his head in the manner that it did and travel in a path almost parallel to the floor, as evidenced by the break in the mirror caused by the bullet. It is also unreasonable to infer that deceased could have dropped the pistol on the floor or some other object causing it to discharge and propel the bullet on a path that would pass through his head in the manner testified to and then strike the mirror at the spot that it did. Nor could one reasonably infer that the deceased was accidentally or intentionally shot by another. The fact that the pistol was found beneath the body of deceased would eliminate accidental shooting by another. And too, "but even if the pistol had been held by the hand of another and accidentally fired, such other party to the transaction would in all probability have made an alarm and remained to explain the tragedy." *Gem City Life Ins. Co.* v. *Stripling,* supra. As to intentional shooting by another, there is no evidence that would support a reasonable inference that such was the case. There was testimony that the deceased was not apparently having any trouble with anyone. There was no fire escape or like means of ingress or egress by way of the windows. The room had only two doors, one of which was sealed and the other locked when the body was discovered. (There was, however, some evidence that the lock on

the usable door was of the type that would lock upon closing the door.) There were no visible signs of disorder in the room other than an unmade bed and no signs of previous commotion. From the evidence the only reasonable inference to be drawn as to the death of insured is that it was by suicide. There are certain elements missing that should appear in a well-tried case, such as specific testimony as to the presence or absence of powder burns on the deceased or the presence or absence of the empty cartridge shell. However, the absence of such testimony does not materially affect the conclusion reached that a finding of suicide was demanded by the evidence.

The evidence demanded a finding for the defendant and the court did not err in directing a verdict for the defendant.

*Judgment affirmed. Sutton, CJ., and Worrill, J., concur.*